**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

YULIYA VLADIMIROVNA K.,[1]          ) Case No. CV 19-2376-JPR
                                    )
                    Plaintiff,      )
                                    ) **MEMORANDUM DECISION AND ORDER**
          v.                        )
                                    )
ANDREW SAUL, Commissioner           )
of Social Security,                 )
                                    )
                    Defendant.      )
                                    )

**I.    PROCEEDINGS**

     Plaintiff seeks review of the Commissioner's final decision
denying her application for Social Security Disability Insurance
Benefits ("DIB").  The matter is before the Court on the parties'
Joint Stipulation, filed March 25, 2020, which the Court has
taken under submission without oral argument.  For the reasons
stated below, the Commissioner's decision is affirmed.

---

     [1] Plaintiff's name is partially redacted in line with
Federal Rule of Civil Procedure 5.2(c)(2)(B) and the
recommendation of the Committee on Court Administration and Case
Management of the Judicial Conference of the United States.

1

**II.   BACKGROUND**

Plaintiff was born in 1977.  (Administrative Record ("AR") 201.)  She has a college degree and has worked as an "[e]ligibility clerk," office assistant, "[o]ffice [t]echnician," and "[p]rogram [t]echnician."  (AR 217.)  She applied for DIB on September 23, 2015, alleging that she had been unable to work since September 30, 2012, because of chronic fatigue syndrome, "[s]evere PMS (with anovulation)," anxiety, "[s]ensitivity to [m]edication/chemicals," "[b]ody aches and pains," "[h]eadaches and [m]igranes," and being "[p]rone to acne."  (AR 184, 216.) After her application was denied initially and on reconsideration, she requested a hearing before an Administrative Law Judge.  (AR 131.)  A hearing was held on September 20, 2017, at which Plaintiff, represented by counsel, testified, as did a vocational expert.  (AR 33.)  In a written decision dated January 16, 2018, the ALJ found her not disabled.  (AR 12-30.)  Plaintiff requested review from the Appeals Council (AR 183), but it denied her request (AR 1).  This action followed.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It

2

1  is "more than a mere scintilla but less than a preponderance."
2  Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec.
3  Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  "[W]hatever the
4  meaning of 'substantial' in other contexts, the threshold for
5  such evidentiary sufficiency is not high."  Biestek v. Berryhill,
6  139 S. Ct. 1148, 1154 (2019).[2]  To determine whether substantial
7  evidence supports a finding, the reviewing court "must review the
8  administrative record as a whole, weighing both the evidence that
9  supports and the evidence that detracts from the Commissioner's
10 conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir.
11 1998).  "If the evidence can reasonably support either affirming
12 or reversing," the reviewing court "may not substitute its
13 judgment" for the Commissioner's.  Id. at 720-21.

14 **IV.  THE EVALUATION OF DISABILITY**

15      People are "disabled" for purposes of Social Security if
16 they are unable to engage in any substantial gainful activity
17 owing to a physical or mental impairment that is expected to
18 result in death or has lasted, or is expected to last, for a
19 continuous period of at least 12 months.  42 U.S.C.
20 § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir.
21 1992).

22      A.   The Five-Step Evaluation Process

23      The ALJ follows a five-step sequential evaluation process in
24 assessing whether a claimant is disabled.  20 C.F.R.

25 _____

26      [2] Plaintiff objects to Defendant's citation to Biestek for
   the "standard of review," complaining that the case "addressed
27 vocational experts, not the meaning of 'substantial evidence.'"
   (J. Stip. at 19.)  But one does not lightly ignore the Supreme
28 Court's observations on a key term governing an area of law.

3

§ 404.1520(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied.  § 404.1520(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied.  § 404.1520(a)(4)(ii) & (c).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded.  § 404.1520(a)(4)(iii) & (d).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[3] to perform her past work; if so, the claimant is not disabled and the claim

---

[3] RFC is what a claimant can do despite existing exertional and nonexertional limitations.  § 404.1545(a)(1); <u>see</u> <u>Cooper v. Sullivan</u>, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).  The Commissioner assesses the claimant's RFC between steps three and four.  <u>Laborin v. Berryhill</u>, 867 F.3d 1151, 1153 (9th Cir. 2017) (citing § 416.920(a)(4)).

4

1    must be denied.  § 404.1520(a)(4)(iv).  The claimant has the

2    burden of proving she is unable to perform past relevant work.

3    Drouin, 966 F.2d at 1257.  If the claimant meets that burden, a

4    prima facie case of disability is established.  Id.

5         If that happens or if the claimant has no past relevant

6    work, the Commissioner then bears the burden of establishing that

7    the claimant is not disabled because she can perform other

8    substantial gainful work available in the national economy, the

9    fifth and final step of the sequential analysis.

10   §§ 404.1520(a)(4)(v), 404.1560(b).

11        B.   The ALJ's Application of the Five-Step Process

12        At step one, the ALJ found that Plaintiff had not engaged in

13   substantial gainful activity since September 30, 2012, the

14   alleged onset date.  (AR 17.)  Her date last insured was

15   September 30, 2018.  (Id.)  At step two, he determined that she

16   had the severe impairments of chronic fatigue syndrome,

17   depression, and anxiety.  (Id.)  At step three he concluded that

18   her impairments did not meet or equal a Listing.  (Id.)  At step

19   four, he found that she had the RFC to perform "light work" with

20   some additional limitations: she could "stand/walk 4 hours in an

21   8-hour workday," "perform simple repetitive tasks," "adapt to

22   occasional workplace changes," and was precluded from work

23   involving hazards, "such as heights and heavy machinery."  (AR

24   19.)  She could not perform her past relevant work.  (AR 24.)  At

25   step five, he determined that she could perform jobs existing in

26   significant numbers in the national economy.  (Id.)  Accordingly,

27   he found her not disabled.  (AR 26.)

28

**V.   DISCUSSION**[4]

   A.   Applicable Background

      1.   Medical opinions and evidence

   Plaintiff saw Dennis Godby, a naturopathic doctor, on November 10, 2012 (AR 322, 324), shortly after her alleged disability onset (AR 131).   She complained of acne and digestive issues, including difficulty "eat[ing] enough fruit [and] veg[g]ies."   (AR 322.)   Her PMS was "really bad," albeit for "just 2 days," and "used to" cause anemia.   (Id.)   Godby ran labs (AR 325) and prescribed four nutritional supplements (AR 324).

   Plaintiff did not return to Godby or otherwise seek medical care again until June 19, 2013, nearly a year after her alleged onset date, when she underwent a physical exam at a clinic to "establish care."[5]   (AR 624.)   Her "primary complaint" was "fatigue."   (Id.)   She reported that "[b]esides the fatigue and anemia, she [had] been generally healthy most of [her] life."   (Id.)   Examination showed no abnormalities.   (See AR 625.)   Her memory was "intact," and she was "oriented to time, place, person, and situation."   (Id.)   She had "normal insight,"

---

   [4] In Lucia v. SEC, 138 S. Ct. 2044, 2055 (2018), the Supreme Court held that ALJs of the Securities and Exchange Commission are "Officers of the United States" and thus subject to the Appointments Clause.   To the extent Lucia applies to Social Security ALJs, Plaintiff has forfeited the issue by failing to raise it during her administrative proceedings.   (See AR 33-78, 303-06, 309-16); Meanel v. Apfel, 172 F.3d 1111, 1115 (9th Cir. 1999) (as amended) (plaintiff forfeits issues not raised before ALJ or Appeals Council); see also Kabani & Co. v. SEC, 733 F. App'x 918, 919 (9th Cir. 2018) (rejecting Lucia challenge because plaintiff did not raise it during administrative proceedings), cert. denied, 139 S. Ct. 2013 (2019).

   [5] Many of these records are unsigned.

6

"exhibit[ed] normal judgment," and "demonstrat[ed] . . .
appropriate mood and affect." (Id.)

Plaintiff returned to the clinic on July 20, 2013, for a pap
smear and breast exam. (AR 623.) She attributed her "fatigue
over the past year" to "stress," noting that "[h]er job was quite
stressful" but that now that she was "on leave" from it, she was
"feeling much better." (Id.) She preferred to treat her
symptoms with "homeopathic remedies" and "nutrition." (Id.)

At another clinic appointment, on July 30, 2013, Plaintiff
reported "fatigue" and "decreas[ed] appetite" but "denie[d]
depression." (AR 366.) She said that in the afternoons she was
"able to do her tasks." (Id.) She had been "on leave from her
job" for the past 10 months. (Id.) Her job had been
"stressful," and she had "drag[ged] herself to . . . work every
single day." (Id.) She was taking online classes "to change the
direction of her career." (Id.)

Plaintiff first visited James Chang, a licensed
acupuncturist,[6] on November 5, 2013, complaining of "skin acne."
(AR 531.) She "often [felt] weak and fatigued." (Id.) Under
"objective" he wrote,

> Pulse: deep, thin, weak Tongue: teethmarks, pale, thin,
> coating is medium white. Bad breath. Q: Quality of
> sleep? A: poor. [C]an hardly get out of bed in the
> mornings.

---

[6] (See AR 531 ("L.Ac." in signature)); see also Cal. Dep't
Consumer Aff. License Search, https://search.dca.ca.gov (search
for "James" and "Chang" under acupuncturists' licenses, narrowing
results by address (see AR 528)) (last visited Apr. 23, 2020).

1   (Id.)  Chang noted that her "[w]eak pulse and pale thin tongue
2   indicate[d] deficient chi and blood" and predicted that it would
3   take "more than a year" to "recover her spleen."  (Id.)

4       She returned to Chang two or three times a month through
5   March 2014.  (See AR 528-30.)  On November 12, 2013, Plaintiff
6   reported that she did not feel "much difference" but did feel
7   "calmer."  (AR 530.)  On November 26, she was "still" tired, "but
8   her rest [was] better" and she had "[s]lightly more energy."
9   (Id.)  On December 10, she reported that "the last batch of herbs
10  gave her more energy"; she was "sleeping better" and "in a better
11  mood."  (Id.)  By December 20, she was "notic[ing] a difference
12  in her daily life": she was "in a better mood" and no longer
13  "nap[ped] immediately after breakfast" or "spen[t] most of her
14  day in her own room."  (AR 529.)  Although she reported worsening
15  symptoms on January 21, 2014, by February 4 her "energy and mood
16  and sleep [were] all better."  (Id.)  On February 25, she was
17  "feeling okay": she could "last until 2:30 pm before needing a
18  nap," was "not as moody" (her mood was "okay"), had periods that
19  did not "set[] her back as much," and was "willing to go out and
20  socialize with her friends like before."  (AR 528.)  Chang
21  thought she was "making good progress."  (Id.)

22      Plaintiff returned to her primary-care clinic on June 1,
23  2015, complaining of "increasing" fatigue.  (AR 341.)  A physical
24  exam was normal, and her memory was "intact."  (AR 342-43.)

25      Plaintiff began "individual" therapy at the clinic on July
26  15, 2014, and at her initial consultation complained of "low
27  energy" and "fatigue."  (AR 448.)  She had "left her job with the
28  state, moved back home, and [was] attending on-line college

classes." (Id.) She had a "history of anemia related to vegetarian diet," but that was "now treated." (Id.) A mental-status examination was normal. (See id.) At a follow-up appointment on July 30, 2015, Plaintiff reported "trouble concentrating on her online classes"; the doctor suspected depression. (AR 445.) Plaintiff stated that when she was previously "diagnosed with depression," she had taken "medications 'for a few days'" but "didn't like how she felt" on them, so she would rather "try 'amino acids' before using prescriptions." (Id.) Her mental-status examination was normal except for reported sleeping problems. (Id.) At her August 15, 2015 therapy appointment, Plaintiff reported that "[her] body [was] missing something." (AR 443.) She was "interested in 'natural healing'" and "afraid of having medications pushed on to her." (Id.)

Plaintiff visited Deepika Goshike,[7] a doctor at her clinic, on October 2, 2015, for a pap smear. (AR 406, 409.) When she saw her again a few weeks later on November 10, she "want[ed] paperwork . . . filled out to file for social security di[s]ability due to her chronic fatigue syndrome." (AR 403.) The doctor noted that she was not taking any of her prescribed medications. (Id.)

Dr. Goshike completed a "chronic fatigue syndrome medical source statement" that day, as Plaintiff requested. (AR 454.)

---

[7] Dr. Goshike appears to be a family-medicine practitioner. See Cal. Dep't Consumer Aff. License Search, https:// search.dca.ca.gov (search for "Deepika" with "Goshike" under doctors' licenses) (last visited May 8, 2020).

9

1  Although she had seen Plaintiff only "for [the] last month," she
2  had been "with [the] Clinic since" June 2013.  (<u>Id.</u>)  She
3  diagnosed her with PMS, acne, polycystic ovary syndrome,
4  hyperlipidemia, and "unexplained" and "persistent" chronic
5  fatigue.  (AR 454.)  She excluded HIV-AIDS, lyme disease,
6  psychiatric disease, rheumatoid arthritis, and alcoholism as
7  causes.  (<u>Id.</u>)  Among other symptoms, Plaintiff had self-reported
8  impairment in short-term memory and concentration that could
9  "cause substantial reduction" in work abilities.  (AR 455.)  She
10  was not on any medications because she was "sensitive to
11  medication" and had "side effects."  (<u>Id.</u>)  Dr. Goshike opined
12  that Plaintiff could walk two blocks without rest or severe pain,
13  sit for 30 minutes at a time and less than two hours in an eight-
14  hour workday, stand for 10 minutes at a time and stand or walk
15  less than two hours in a workday, and required a sit/stand
16  option.  (<u>Id.</u>)  She needed to take unscheduled 30-minute to hour-
17  long breaks "every hour."  (AR 456.)  She could lift 10 pounds
18  "occasionally" and less than 10 pounds "frequently," and she
19  could only "rarely" crouch or squat or climb ladders or stairs.
20  (<u>Id.</u>)  She was also "sensitive to humidity, noise, strong odors,
21  chemicals, and if it is too cold or hot."  (AR 457.)
22  "[A]ccording to patient," her "symptoms and limitations" started
23  "3 years ago."  (<u>Id.</u>)

24       Edward Fuchs, a general practitioner, performed a
25  comprehensive evaluation of Plaintiff at Defendant's request on
26  November 14, 2015.  (AR 458, 461.)  Dr. Fuchs observed that she
27  "was able to walk to the examination room without difficulty,"
28  "sit comfortably," and "get on and off the exam table."  (AR

459.)  He noted no abnormalities on examination.  (See AR 459-61.)  He diagnosed her with "[c]hronic fatigue." (AR 461.)  He opined that she could stand and walk "[u]p to four hours in an eight-hour workday" because she gave a "good history for fatigue even though she [had] no physical limitations." (Id.)  "[O]wing to her size,"[8] she could lift, carry, push, and pull only "20 pounds occasionally and 10 pounds frequently." (Id.)  She had no other limitations.  (See id.)

Plaintiff saw Alysia Liddell, a psychologist (see AR 467), on November 17, 2015, for a "comprehensive psychiatric evaluation," also at Defendant's request.  (AR 463.)  Dr. Liddell noted that Plaintiff's only "previous mental health treatment" was "secondary to medical concerns," and she was "not currently under the care of a mental health professional." (AR 464.)  She denied any "history of psychiatric hospitalizations" or self-harm.  (Id.)  On examination, her "stream of mental activity was within normal limits," her "thought processes were tight, logical, and goal oriented," and her speech was "logical, coherent, and concise." (AR 465.)  She appeared depressed.  (AR 466.)  She had no problems with short-term memory or concentration.  (Id.)  Dr. Liddell diagnosed her with anxiety disorder (id.) and opined that

> [her] ability to understand and remember, and carry out
> very short and simple instructions is unimpaired.
> [¶][Her] ability to understand and remember detailed

---

[8] Plaintiff was five feet six inches tall and weighed 122 pounds.  (AR 459.)

1    instructions is unimpaired.  [¶][Her] ability to accept

2    instructions from a supervisor and respond appropriately

3    is   unimpaired.    [¶][Her]   ability   to   interact   with

4    coworkers is unimpaired.  [¶][Her] ability to deal with

5    various  changes  in  the  work  setting  is  moderately

6    impaired  given  her  current  level  of  anxiety  and

7    depression.

8  (AR 467.)

9       On November 30, 2015, Chang completed a "chronic fatigue

10  syndrome medical source statement" almost identically to Dr.

11  Goshike.  (AR 471.)  He had treated Plaintiff "weekly for 6

12  months starting" in November 2013 but had not seen her for more

13  than a year.[9]  (Id.)  She had been "incapacitated by Chronic

14  Fatigue since 2012 to the point of spending most of her day in

15  bed."  (Id.)  He diagnosed her with "spleen [and] liver

16  deficiency" and "extre[]me PMS."  (Id.)  He noted that she was

17  "25% better now after 6 months of [traditional Chinese medicine]

18  treatment that ended" in April 2014; she could expect "100%

19  recovery if . . . treated for 2 years."  (Id.)  She had taken

20  "Chinese herbal formulas with positive results in energy, skin,

21  digestion," and pain reduction.  (AR 472.)  He opined that she

22  could walk one or two blocks without rest or severe pain, sit for

23  20 to 30 minutes at a time and less than two hours in an eight-

24  hour workday, stand for 10 to 15 minutes at a time and less than

25  two hours in an eight-hour workday, and needed a sit/stand

26

27        [9] Chang actually saw Plaintiff for less than five months and
    usually only two or three times a month, not weekly.  (See AR
28  528-31.)

option.  (Id.)  She would need to take unscheduled 30-minute to
hour-long breaks every hour.  (AR 473.)  She could lift 10 pounds
"occasionally" and less than 10 pounds "frequently"; she could
not climb ladders or stairs.  (Id.)  She could be expected to be
"off task" more than 25 percent of a typical workday.  (Id.)  She
could tolerate "moderate" stress "on a really good day" and was
"capable of low stress jobs."  (AR 474.)  She had limitations
related to "noise, stress, smells, weather, lighting, [and]
chemicals."  (Id.)  She had "[s]elf-reported" memory and
concentration impairment.  (AR 472.)

On January 4, 2016, state-agency doctor S. Amon[10] reviewed
Plaintiff's medical records and opined that she could lift and
carry 20 pounds occasionally and 10 pounds frequently and could
stand or walk and sit "[a]bout 6 hours" each in an eight-hour
workday.  (AR 90.)  She had no other limitations.  (Id.)  Dr.
Amon apparently consulted with Allan Harris, a psychologist,[11]
concerning Plaintiff's mental limitations, although Dr. Amon
alone signed the disability determination.  (Compare AR 88 (Dr.
Harris), with AR 93 & 94 (Dr. Amon).)  On April 19, 2016, B.
Sheehy[12] agreed on reconsideration, assessing identical

_____

[10] Dr. Amon's electronic signature includes a medical-
specialty code of 12 (AR 94), indicating family or general
practice.  See Soc. Sec. Admin., Program Operations Manual System
(POMS) DI 24501.004 (May 5, 2015), https://secure.ssa.gov/apps10/
poms.nsf/lnx/0424501004.

[11] Dr. Harris's electronic signature includes a medical-
specialty code of 38 (AR 88), indicating psychology.  See POMS DI
24501.004, supra note 10.

[12] Dr. Sheehy's electronic signature includes a medical-
(continued...)

13

1    limitations.  (AR 107, 110.)  Dr. Sheehy was similarly assisted

2    by Pamela Hawkins,[13] a psychologist.  (See AR 105.)

3        Plaintiff sought counseling on April 15, 2016, for her

4    "anxiety and low level depression secondary to chronic fatigue

5    syndrome."  (AR 568.)  She reported "decreased" strength and

6    concentration but had "tried to return to work."  (Id.)  She had

7    no "history of psychiatric symptoms prior to getting what she

8    believe[d] [was] chronic fatigue syndrome."  (AR 570.)  She had

9    taken a "leave of absence" from her job in 2012: "she pushed

10   herself outside of her comfort zone but unfortunately she

11   ultimately quit because . . . she wasn't able to fulfill the

12   responsibilities of her job."  (Id.)  She was noted to be

13   applying for SSDI.  (Id.)  She was diagnosed with "moderate"

14   anxiety and "depressive episodes."  (AR 574.)  She returned for

15   three more counseling sessions.  (See AR 533 (Aug. 5, 2016

16   appointment), 538 (July 1, 2016), 541 (May 5, 2016).)

17       Plaintiff underwent a behavioral-health consultation on

18   April 2, 2017, following the birth of her daughter.  (AR 674.)

19   She was noted to have a "history of undiagnosed anxiety and

20   depression."  (Id.)  The consultation arose because she had

21   exhibited "symptoms of anxiety at the hospital over her inability

22   to breast feed" her baby and concerns about her ability to care

23   for her upon discharge.  (Id.)  She "did not think . . . her

24   _____

25       [12] (...continued)
     specialty code of 20 (AR 112), indicating neurology.  See POMS DI
26   24501.004, supra note 10.

27       [13] Dr. Hawkins's electronic signature includes a medical-
     specialty code of 38 (AR 88), indicating psychology.  See POMS DI
28   24501.004, supra note 10.

situation [was] dire enough to require psychiatric help,"
stating, "'I did not say I was suicidal and do not need to be
assessed.'" (<u>Id.</u>) She "just fe[lt] overwhelmed with the coming
of the new baby." (<u>Id.</u>) She had "tried to call around for a
psychiatrist but was unable to get any appointments." (<u>Id.</u>) She
was "willing to accept a low dose antidepressant, but want[ed] to
be watchful to what she takes since her body does not tolerate a
lot of medication" and because anxiolytics[14] made her "jittery."
(<u>Id.</u>) She was "calm and rational[]" during the assessment. (AR
678.) The doctors concluded that she would "benefit from a low
dose anti-depressant" and outpatient care with a psychiatrist or
therapist. (<u>Id.</u>)

        2.  <u>Plaintiff's testimony and statements</u>

    Plaintiff completed a "pain questionnaire" on October 8,
2015. (AR 227, 229.) She reported pain "throughout [her] body —
muscle, joints" — that began "[a]bout 2 years ago." (AR 227.)
The pain was "dull" and "mild to sometimes moderate" and would
spread to her back, legs, arms, shoulders, and neck or manifest
as a headache. (<u>Id.</u>; <u>see also</u> <u>id.</u> (stating that she had
migraines that began about three years prior).) It was
exacerbated by "weather change," "walking," "overexertion,"
"certain noises," "heat," and "hormonal situations (PMS)." (<u>Id.</u>)
She would lie down to relieve her pain. (<u>Id.</u>) "[Her] body
[couldn't] handle medications." (<u>Id.</u>) Even "[h]alf a pill" of

---

[14] Anxiolytics are medications used to prevent or treat
anxiety and related disorders. <u>About Anxiolytics</u>, Healthline,
https://www.healthline.com/health/anxiolytics (last visited May
8, 2020).

Tylenol or Excedrin would cause "side effects," including "digestive problems," "pain in the liver area (right side)," "dizziness," "nausea," and "stomach ache." (AR 227-28.) An "[e]psom salt bath" provided "[t]emporary [r]elief." (AR 228.) Sitting "in front of a computer for more than 20-30" minutes "hurt[] [her] back." (Id.) She could stand for five to 10 minutes and sit for 20 to 30 minutes at a time. (AR 229.) She could do "light housekeeping (i.e., dusting, cooking, etc.) without assistance." (Id.)

Plaintiff completed a function report on October 8, 2015. (AR 233-41.) She had been "chronically tired for the past 3 years," and it was "extremely difficult" for her "to do any type of work or activities" or to "commit to and maintain a job." (AR 233.) She would "wake up very fatigued" "most days," and her fatigue would "continue throughout [the] day." (Id.) She had to "[l]ay down" and "often" took naps, making her daytime schedule "unpredictable." (Id.) Some days she "just spen[t] mostly [l]aying down." (Id.) Her "constant" fatigue affected her "physical and mental performance": she had "problems with short t[e]rm memory, concentrating on a given work task," and "keeping up with productivity requir[e]ments." (Id.) Her symptoms caused her "stress" and difficulty "sustain[ing] work/job routines," resulting in her "regular[ly] calling in sick" to work. (Id.)

During the day she "might read" or "make a few calls for herself or [her] parents." (AR 234.) If she "need[ed] to go somewhere," she would "nap prior to see if it g[ave] her a little more energy." (Id.) She would "visit her parents who live[d] 5 min[utes] away" and "nap there"; otherwise she would "stay home

16

all day" and rest "until bed time." (Id.)  On some days she did not have enough energy to dress herself or "take a shower in the morning," so she would "stay in [her] pajamas." (Id.)  She did not need reminders to tend to her personal needs or take medicine.  (AR 235.)

She prepared her own meals once or twice a week — "[s]omething simple" that she could "[j]ust put . . . in the oven." (Id.)  She could make her bed and do dishes about once a week.  (Id.)  She went outside alone a "[c]ouple of days a week," although she felt "more comfortable" when "someone [was] with [her]." (AR 236.)  She drove "only when [she felt] ok enough to drive and concentrate on the road." (Id.)  She shopped in stores and online for groceries and clothing.  (Id.)  She could pay bills, count change, and use a checkbook, although sometimes she would "postpone" financial tasks until she "[felt] ok enough to concentrate" on them.  (AR 236-37.)  She enjoyed reading and watching TV (AR 237); she did yoga "about once a month" (id.; cf. id. (claiming she did not "have energy" for yoga "anymore")).  On days that she felt "ok" she would "watch a movie" with her "parents or a friend" or "have a short phone conversation with them." (Id.)  She would go to church on holidays, depending on how she felt.  (Id.)  She did not "go out" or "socialize anymore" "on a regular basis." (AR 238.)

She could "only lift [about] 5 pounds (occasionally)" and could walk no more than 10 to 15 minutes before she needed to rest for between 20 minutes and "1-2 hours." (Id.)  She had "difficulty" finishing tasks "on time" and "concentrating"; when she was "extremely tired" her "speech" was "affected." (Id.)

She was "sensitive to stress," which she didn't "handle . . .
well," especially during her PMS, which lasted "2 weeks every
month." (AR 239 (emphasis in original).) She became "anxious"
in "crowded stores" or when she heard "certain music." (Id.)
She was "very sensitive" to any type of medication and could only
"occasionally" take an over-the-counter painkiller, although
"even that affect[ed her] digestion." (AR 240.) Nothing had
helped her fatigue. (Id.)

At the September 20, 2017 hearing, Plaintiff testified that
she had recently given birth and had "temporarily" moved to Los
Angeles. (AR 35.) She was living with her parents, who "help[ed
her] with the baby" and would "probably be there for as long as
[she needed] help with [her] baby." (AR 35-36.) Giving birth
"put a little more strain on [her] body," so she felt "more
tired" and "definitely need[ed] more rest." (AR 43.) Her
parents "help[ed]" her "feed [the baby] at night" and "help[ed]"
bathe her. (AR 44.) She and her parents "[took] turns" walking
with the baby. (AR 45.) She fed the baby and read to her by
herself. (AR 53.)

She had a valid driver's license and drove "[o]n good days."
(AR 36.) She tried "not to drive too far" because after half an
hour she would "start losing concentration on the road" and feel
"exhaust[ed]" and "[j]ust very tired." (AR 36-37.) She had
taken a Greyhound bus from Los Angeles to Sacramento for her
hearing. (AR 36.)

On bad days she would "not be[] able to take a shower for
the first part of the day" and would have to take "two naps
during the day." (AR 48.) She had bad days "[t]wo to three days

18

a week." (Id.)  She could lift "maybe" five pounds "on a good
day" given her "back pain," which had "got[ten] worse" since her
pregnancy. (AR 52-53.)  When questioned about the discrepancy,
she acknowledged that she could lift her 15-pound baby "for sure"
but "wouldn't carry her around for too long" and would "have to
sit with her" and "fix [her] back" to "feel comfortable enough."
(AR 53.)

Being around "a lot of people" triggered her anxiety.
(AR 58.)  For instance, "the last time [she] was in LA," she
"went to . . . an In and Out" and got a "rotisserie chicken to
eat," but she didn't have time to "cook" it before she "left"
because of anxiety. (AR 58-59.)  When someone who she
anticipated would want to talk "for at least 15 minutes" would
call her, she wouldn't pick up. (AR 60.)

She was no longer on any medications. (See AR 45-46.)  She
had "tried different approaches" in recent years but had found
that the antidepressants didn't help with her fatigue; to the
contrary, they gave her "side effects" and "actually [made] her
depressed." (AR 45.)  When she had a migraine she took Excedrin
Migraine, which was "the only thing that" worked. (AR 50-51.)
Apart from half a dose of Tylenol, she did not take anything for
pain; she had a "sensitivity" to "all medications" that
manifested as adverse "side effects," including digestive issues
and nausea. (AR 51.)  Tylenol made her feel "a little dizzy" and
nauseated and gave her a rash. (Id.)  She took her prescribed
antianxiety medication "a few times" but it made her feel "very
shaky" and "nervous." (AR 52.)  She had no more issues with
anemia. (Id.)  Her CFS treatment was "[m]ostly herbal"; her

19

1  doctors had told her that "there is no medication for Chronic

2  Fatigue."  (AR 46.)  Her acupuncture had had "almost . . . no

3  effect on [her] chronic fatigue."  (AR 55.)  When she felt

4  depressed or anxious, she talked to her sister, who "just

5  graduated with a psychology diploma."  (AR 46.)  She had been

6  given phone numbers for "professionals" but hadn't contacted

7  them.  (Id.)

8      She had a bachelor's degree, with a major in government and

9  an international-relations concentration.  (AR 37.)  She had

10 taken a six-month online nutritional course but had asked for and

11 been granted an "extension" "because of [her] condition" to

12 complete it in two years (AR 37-38), which she did (AR 38).  (See

13 AR 39 (Plaintiff testifying that she got extension because she

14 "needed more time for each session than [she] would if [she]

15 didn't have the condition").)  Before she became pregnant, she

16 did "Yin Yoga" in 30-minute weekly sessions.  (AR 47-48.)  As she

17 explained, that type of yoga involves "stretch[ing] and

18 [relaxing]" in a "calm and peaceful environment," without

19 "straining."  (AR 47.)

20          3.   Third-party statement

21     Plaintiff's friend and roommate Alexandre Frolov completed a

22 third-party function report on October 10, 2015.  (AR 245.)  He

23 had known Plaintiff for 12 years and saw her "on evenings after

24 work" and "most weekends," when the two of them would cook,

25 clean, take short walks, and watch TV.  (Id.)  Her condition had

26 worsened "dramatically" over the "past 3 years": she woke up

27 "very tired in the morning," was often unable to cook or clean

28 "without help," and looked "sick and exhausted" "[m]ost of the

20

time." (Id.) She "often need[ed] help to complete house
chores." (AR 247.) Often when he returned from work, "she [was]
dressed the same way she was" when he left in the morning. (AR
246.) He did "most of the household work," although Plaintiff
would "help[] a little" when she felt "ok." (AR 247.) She went
outside a "[f]ew times a week" and could drive. (AR 248.) She
went to a park once a week and took "short walks" around their
apartment complex "2-3 times a week." (AR 249.) The rest of the
time she read, watched TV, or napped. (Id.) "Sometimes she
need[ed]" to be "remind[ed] about her" medical appointments or
"to make a phone call." (Id.) Over the "past few years" she had
been "minimally social" and avoided "social gatherings." (AR
250-51.) It took her a "long time" to recover from "stressful
situations." (AR 251.) She was "extremely sensitive to noise,
loud music or speech, [and] violence on TV." (Id.) She was
"very sensitive to chemical products/smells." (AR 252.)

     B.   <u>Analysis</u>[15]

          1.   <u>The ALJ permissibly discounted Plaintiff's
subjective symptom statements and testimony</u>

               a.   *Applicable Law*

An ALJ's assessment of a claimant's allegations concerning
the severity of her symptoms is entitled to "great weight."
<u>Weetman v. Sullivan</u>, 877 F.2d 20, 22 (9th Cir. 1989) (as amended)
(citation omitted); <u>Nyman v. Heckler</u>, 779 F.2d 528, 531 (9th Cir.
1985) (as amended Feb. 24, 1986). "[T]he ALJ is not 'required to

---

[15] The Court addresses the issues in an order different from
that briefed by the parties, for clarity and other reasons.

believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (quoting Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis. See Lingenfelter, 504 F.3d at 1035-36; see also SSR 16-3p, 2016 WL 1119029, at *3 (Mar. 16, 2016). First, the ALJ must determine whether the claimant has presented "objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged." Lingenfelter, 504 F.3d at 1036 (citation omitted). If such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." Id. (citation omitted & emphasis in original).

If the claimant meets the first test, the ALJ may discount the claimant's subjective symptom testimony only if he makes specific findings that support the conclusion. See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or affirmative evidence of malingering, the ALJ must provide a "clear and convincing" reason for rejecting the claimant's testimony. Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015) (as amended) (citing Lingenfelter, 504 F.3d at 1036); Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014). The ALJ may consider, among other factors, the claimant's (1) reputation for truthfulness, prior inconsistent statements, and other testimony that appears less than candid;

1   (2) unexplained or inadequately explained failure to seek

2   treatment or to follow a prescribed course of treatment; (3)

3   daily activities; (4) work record; and (5) physicians' and third

4   parties' statements.   See Rounds v. Comm'r Soc. Sec. Admin., 807

5   F.3d 996, 1006 (9th Cir. 2015) (as amended); Thomas v. Barnhart,

6   278 F.3d 947, 958-59 (9th Cir. 2002).   If the ALJ's evaluation of

7   a claimant's alleged symptoms is supported by substantial

8   evidence in the record, the reviewing court "may not engage in

9   second-guessing."   Thomas, 278 F.3d at 959 (citation omitted).

10                  b.   *The ALJ's Decision*

11          The ALJ found Plaintiff's "statements concerning the

12   intensity, persistence and limiting effects" of her symptoms "not

13   entirely consistent with the medical evidence and other evidence

14   in the record." (AR 20.)   He found them unsubstantiated by

15   objective medical evidence, noting a "lack of objective

16   diagnostic studies" and "few significant findings" on physical

17   examination.   (Id.)   Moreover, they were "inconsistent with

18   treatment records" showing that her physical and mental

19   conditions were "well controlled."   (Id.; see AR 21 (noting that

20   mental-status examinations had "often revealed few significant

21   findings").)   He noted as well that her treatment had been

22   "conservative in nature," consisting entirely of "office visits

23   for routine complaints and check-ups," with "no surgeries,

24   hospitalizations, or extended or specialized care." (AR 20; see

25   AR 21 (noting that she was "not on any psychotropic medications"

26   and had "refused to take medications" for her chronic fatigue,

27   primary insomnia, and recurrent depression).)   He also found her

28   allegations inconsistent with medical-opinion evidence showing

                                    23

that she had "considerable work-related abilities despite her impairment" (AR 21) and, specifically, with the opinions of the two consulting examiners, Drs. Fuchs and Liddell (see AR 22 (giving those opinions "great weight")).

The ALJ also found Plaintiff's allegations "inconsistent with" her activities of daily living because they showed she was "functional." (AR 22.) For instance, she had "no problems with personal care," took "care of her baby," "perform[ed] household chores," shopped "in store" and "online," ran "errands . . . without assistance," attended online classes, and could handle her finances. (AR 22-23.) She went "to the park once a week," took walks around her apartment complex, and did yoga. (AR 23.) She took a Greyhound bus from Los Angeles to Sacramento for her hearing. (Id.) She had a "valid drivers license" and drove. (Id.) Overall, he found her "wide range" of activities was not as limited as would be expected "given [her] complaints." (Id.) Finally, the ALJ concluded that Plaintiff had "provided inconsistent information" about "how much she can lift," namely, she "stated that she cannot lift 10 pounds"[16] but "testified that she lifts her 15-pound baby." (Id.)

Ultimately, the ALJ found Plaintiff's allegations "partially consistent" with and "supported by her diligence in seeking care for her mental disability and fatigue syndrome." (Id.) But he concluded that although she continued to experience some

---

[16] Plaintiff actually stated in her function report that she could "only lift [about] 5 pounds (occasionally)" (AR 238) and later testified that she could lift "maybe" five pounds "[o]n a good day" (AR 52).

24

1  symptoms, they were "so well controlled" that she could still
2  "perform a wide range of light work with simple repetitive
3  tasks." (Id.)

c.  *Analysis*

5  Plaintiff challenges the ALJ's partial discounting of her
6  subjective symptom statements. (See J. Stip. at 12-16.)[17]  For
7  the reasons discussed below, the ALJ did not err.

i.  *Medical and other evidence*

9  The ALJ properly concluded that Plaintiff's subjective
10 symptom statements were inconsistent with the medical evidence.
11 (See AR 20); Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595,
12 600 (9th Cir. 1999) (finding "conflict" with "objective medical
13 evidence in the record" to be "specific and substantial reason"
14 undermining plaintiff's allegations); § 404.1529(c)(2).

15 Plaintiff alleged that her "constant[] fatigue" caused
16 symptoms that made it difficult for her to "sustain work/job
17 related routines." (AR 233.)  More specifically, she had
18 fatigue-related "problems with short t[e]rm memory" that affected
19 her ability to "concentrate on a given work task" or "keep[] up
20 with productivity requir[e]ments." (Id.; see also AR 223 ("My
21 constant feeling of being fatigued for quite a long time already
22 gets [i]n the way of my productivity and ability to do basic
23 tasks.").)  But repeatedly on examination she was noted to have

24
25
26

27  [17] For nonconsecutively paginated documents, the Court uses
    the pagination generated by its Case Management/Electronic Case
28  Filing system.

25

no memory problems[18] (see, e.g., AR 343 (memory "intact" on June 1, 2015), 346 (same on Mar. 17, 2015), 348 (same on Jan. 22, 2015), 361 (same on July 15, 2014), 369 ("negative" for "memory impairment" on June 18, 2013), 491 ("negative" for "memory loss" on Aug. 3, 2017), 547 (memory "normal" on Apr. 9, 2017), 555 (same on Aug. 23, 2016)), as the ALJ noted (AR 20, 23).  (But see AR 351 ("positive" for "[m]emory impairment" on Dec. 1, 2014).) Her mental-health providers did not note any memory problems either.  (See, e.g., AR 443 (memory "intact" at Aug. 15, 2014 therapy session), 445 (same on July 30, 2014), 448 (same on July 15, 2014).)  And Dr. Liddell's November 17, 2015 comprehensive psychiatric evaluation revealed no problems with her "immediate," "recent," or "long-term" recall.  (See AR 466.)  Although fatigue symptoms of CFS are often of necessity "self-reported," see Reddick, 157 F.3d at 726, the ALJ did not err in discounting Plaintiff's statements when doctors' treatment notes routinely directly contradicted the existence of alleged memory issues, see id. (distinguishing other common symptoms of CFS, including "memory problems," which can be objectively assessed).[19]

Similarly, Plaintiff testified that her speech often became "affected" as a result of her fatigue (AR 238), but doctors noted no such affectation (see, e.g., AR 445 (speech "appropriate" on

_____

[18] Observable abnormalities of thought, memory, mood, and perception are objective medical evidence.  See § 404.1502(f) & (g).

[19] Notably, Plaintiff's roommate, in filling out a third-party function report, did not check the box for "memory" when asked to indicate things the "disabled person's illnesses, injuries, or conditions affect."  (AR 250.)

July 30, 2014), 448 (same on July 15, 2014), 459 (Dr. Fuchs finding her speech "audible, understandable, and sustainable" on Nov. 14, 2015), 574 (speech "clear" on Apr. 15, 2016), 678 (speech "appropriate in rate, rhythm, volume and tone" on March 27, 2017)).  To the contrary, Dr. Liddell noted that her "stream of mental activity" was "normal," "thought processes were tight, logical, and goal oriented," speech was "logical, coherent, and concise," "[a]rticulation was clear," and "[v]elocity and volume were normal."  (AR 465 (Nov. 17, 2015 comprehensive psychological-evaluation report).)

The ALJ also properly concluded, based on his thorough review of the treatment records, that Plaintiff's symptoms could be adequately managed with medication and other treatments.  (See AR 20-21 (ALJ finding that Plaintiff's mental and physical conditions were "well controlled")); SSR 16-3p, 2016 WL 1119029, at *6 (ALJ may consider information in medical records about onset of symptoms, their change over time, and plaintiff's self-reported activities in evaluating subjective symptoms); § 404.1527(c)(3).  As he detailed at length, Plaintiff repeatedly reported to her acupuncturist that her fatigue was improving.  (See AR 21; see also AR 23 (ALJ noting that Plaintiff "reported . . . that the [acupuncture] treatment has been generally successful in controlling [her] symptoms").)  Specifically, she reported "[s]lightly more energy" on November 26, 2013, just a few weeks after she began acupuncture treatment.  (AR 530.)  By December 10, 2013, she had "more energy" still and was "sleeping better."  (Id.)  And by December 20, 2013, her symptoms had improved to the extent she "notice[d] a difference in her daily

life": she was no longer napping in the mornings or spending most of her day in the bedroom.  (AR 529.)  On February 4, 2014, she reported that her "energy and mood and sleep [were] all better," and she was going "out for walks."  (Id.; see also id. (reporting on Feb. 18, 2014, that she was going on 30-minute walks "every day").)  By February 25, 2014, she could "last until 2:30 pm before needing a nap."  (AR 528.)

And as the ALJ noted, none of Plaintiff's conditions required specialized or extended medical care or hospitalization.[20]  (See AR 20.)  Notably, she sought mental-health care only intermittently, first for three appointments in 2015 (see AR 443-48) and then for three more in 2016 (see AR 559-74).  (See also AR 23 (ALJ noting that Plaintiff's "mental health care was brief").)  The only other record of mental-health care was an in-hospital consultation following the birth of her daughter, apparently related to concerns about possible postpartum depression.  (See AR 674 (Mar. 29, 2017 behavioral-health-consultation record).)  During that consultation, Plaintiff reported symptoms of depression and anxiety but "did not think that her situation [was] dire enough to require psychiatric help" (id.; see id. (Plaintiff stating, "I did not say I was suicidal and do not need to be assessed.")), and the doctors recommended only a "low dose" antidepressant and "outpatient" therapy (AR 674, 678).  Otherwise, the treatment

---

[20] The ALJ stated that there were no hospitalizations in the record.  (AR 20.)  That is not strictly true, however, given that Plaintiff was hospitalized for the birth of her daughter.  (See AR 674.)

records contain only isolated appointments for discrete issues. (See, e.g., AR 322 (Nov. 10, 2012 naturopathic appointment for acne, digestion, and PMS), 337 (Oct. 2, 2015 "well woman" visit with Dr. Goshike), 494-526 (prenatal-care records dated Sept. 27, 2016 through Apr. 21, 2017), 575 (Mar. 7, 2016 appointment for "left foot pain"); see also AR 20 (ALJ noting that "treatment [Plaintiff] has received for all of her impairments have been office visits for routine complaints and check-ups").)

    Moreover, Plaintiff repeatedly refused medicinal treatment and often failed to take medication she had been prescribed, as the ALJ noted.  (See, e.g., AR 21 (ALJ noting that she had "refused to take medications" for her chronic fatigue, primary insomnia, and recurrent depression), 23 (ALJ noting that "[d]espite the complaints of allegedly disabling symptoms, [Plaintiff] has not taken any medications for those symptoms").) Indeed, Plaintiff's doctors prescribed at least four medications for her fatigue during 2015.  (See AR 341, 344, & 346 (discussing "quadruple therapy" for lethargy).)  But when she asked Dr. Goshike to fill out her disability form in November "due to her chronic fatigue," the doctor noted that she was "not taking" any of them.  (AR 403; see also AR 22 (ALJ noting same).)  She at times indicated that she did not take her medications because they caused adverse side effects.  (See, e.g., AR 240 (Plaintiff stating on Oct. 8, 2015, that she "can't take [medicine] for body/muscle pain" because she is "very sensitive" to "any types of medications"), 459 (stating to Dr. Fuchs on Nov. 14, 2015, that "every medicine she has tried has had side effects"); see also AR 455 (Dr. Goshike noting that Plaintiff was "sensitive to

medication and has side effects, so she is not on any medication").)  At other times, however, she expressed an ideological preference for alternative medicine.  For instance, on August 15, 2015, she terminated her individual-therapy treatment, stating that she was "interested in 'natural healing'" and "afraid of having medications pushed on" her.  (See AR 443; see also AR 623 (Plaintiff stating on July 30, 2013, that she preferred to treat her symptoms with "homeopathic remedies" and "nutrition").)  And she told a doctor in March 2017 that she didn't want to take antidepressants because a friend took them and killed herself.  (AR 674.)  The ALJ properly considered Plaintiff's failure to follow medically advised treatment in evaluating her subjective symptom testimony.  See Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008); Sights v. Colvin, No. 6:15-cv-00717-AA, 2016 WL 5402746, at *3 (D. Or. Sept. 26, 2016) (that plaintiff "chose not to take prescribed medications" and elected "homeopathic remedies" over "suggested treatments . . . permit[ted] an inference that [her] symptoms [were] not as severe as alleged").[21]

The ALJ also properly discounted Plaintiff's allegations as inconsistent with the medical-opinion evidence (AR 21), which is a valid basis to discount a claimant's subjective symptom testimony.  See Molina, 674 F.3d at 1113 (examining doctor's opinion that condition "was not severe" and could be "control[led]" was "specific, clear, and convincing reason[]" to

---

[21] Because Plaintiff was prescribed treatments she didn't follow, her argument that CFS has an "absence of treatment . . . modalities" (J. Stip. at 14) is off the mark.

reject subjective symptom testimony).  Although Plaintiff claimed
that her symptoms rendered her unable to "do any type of work or
activities" (AR 233), two examining doctors and the state-agency
reviewing doctors disagreed.  Notably, Dr. Fuchs partially
credited her subjective symptoms in his assessment, limiting her
standing and walking to four hours in an eight-hour workday to
accommodate her chronic fatigue.  (See AR 461 (Fuchs noting that
she gave "a good history for fatigue even though she [had] no
physical limitations").)  Nonetheless, he opined that she was
capable of light work with some additional limitations (see id.),
far less limited than she claimed to be (see, e.g., AR 238
(claiming she could lift only "about" five pounds and walk 10 to
15 minutes at a time)).  Moreover, Dr. Liddell opined, based on
her comprehensive psychiatric evaluation, that Plaintiff had no
mental or cognitive limitations apart from moderate impairment in
her ability to deal with workplace changes because of her
"anxiety and depression" (AR 467), which was inconsistent with
Plaintiff's claims of fatigue-related "problems" with her short-
term memory and concentration (AR 233).  The state-agency
reviewing doctors agreed that Plaintiff's impairments were not
severe enough to prevent her from working.  (AR 90, 110.)
Discounting her allegations because they were inconsistent with
the medical and other evidence was proper.

### ii.  *Daily activities*

The ALJ also properly discounted Plaintiff's allegations as
inconsistent with her daily activities.  (AR 22.)  An ALJ may
discredit a claimant's subjective symptom testimony "when [she]
reports participation in everyday activities indicating

capacities that are transferable to a work setting." <u>Molina</u>, 674
F.3d at 1113 (citation omitted).  "Even where those activities
suggest some difficulty functioning, they may be grounds for
discrediting the claimant's testimony to the extent that they
contradict claims of a totally debilitating impairment," <u>id.</u>
(citations omitted), or "suggest" that her "claims about the
severity of [her] limitations were exaggerated," <u>Valentine v.
Comm'r Soc. Sec. Admin.</u>, 574 F.3d 685, 693 (9th Cir. 2009).

As the ALJ noted, Plaintiff's activities demonstrated that
she was "functional." (AR 22.)  She was able to prepare her own
meals, make her bed, do dishes, shop online and in-store, and
manage her finances. (AR 235-36; <u>see also</u> AR 245 (roommate
noting that he and Plaintiff cooked, cleaned, took short walks,
and watched TV together).)  She had a driver's license and drove,
and she went to church on holidays. (AR 36, 236.)  She did yoga.
(AR 237; <u>see</u> AR 47-48.)  She took online courses in nutrition
and, with an extension, completed the program.[22] (<u>See</u> AR 37-39.)
She had recently had a baby and cared for her with her family's
"help." (AR 35-36; <u>see</u> AR 44 (Plaintiff testifying that her

_____

[22] Plaintiff told the agency she enrolled in the nutrition
course "to help [herself] eat a more balanced diet" (AR 217), but
she told her doctor she was taking classes online "to change the
direction of her career" (AR 366).  Indeed, Plaintiff appears to
have taken online courses — apparently including but not limited
to the nutrition class — for at least three years during the
alleged disability period. (<u>See, e.g.</u>, AR 366 (telling doctor in
July 2013 that she was taking online classes), 448 (reporting
taking online "college classes" in July 2014), 38 (Plaintiff
testifying that she finished two-year online nutrition class
about a year before baby was born, which was March 2017).)
Plaintiff told the ALJ that the only class she had taken after
graduating college was the nutrition course. (AR 37.)

parents helped her feed baby "at night," bathe her, and walk with her), 53-54 (testifying that she sometimes fed and read to baby by herself).)  The ALJ properly concluded that these activities suggested some ability to work and were inconsistent with Plaintiff's claims of extreme fatigue.  See Burch v. Barnhart, 400 F.3d 676, 680 (9th Cir. 2005) (ALJ properly discounted plaintiff's credibility when her activities "suggest[ed] that she is quite functional" because she was "able to care for her own personal needs, cook, clean and shop," "interact[] with her nephew and her boyfriend," and "manage her own finances"); Fleming v. Astrue, 274 F. App'x 571, 572 (9th Cir. 2008) (ALJ properly discounted plaintiff's claims concerning effects of her CFS given her daily activities, which included gardening and bicycling).

Plaintiff complains that the ALJ "omit[ted] important qualifiers and information" about her ability to complete these tasks on a regular basis.  (J. Stip. at 16; see also id. at 3-4 (challenging ALJ's characterization of her testimony).)  She alleged that her "[b]ody aches and pains" limited her ability to work (AR 216), and she completed a pain questionnaire alleging specific pain-related limitations (see AR 227).[23]  For instance, she stated that she couldn't sit for 20 to 30 minutes without back pain.  (AR 228.)  But she was able to take a Greyhound bus

---

[23] Plaintiff suggests that her primary or even sole "disabling allegation [was] fatigue and fatigability." (J. Stip. at 16.)  But as discussed, in addition to her fatigue and fatigue-derived symptoms, she also alleged, for example, "[s]evere PMS," anxiety, "[s]ensitivity to medication/chemicals," acne, and "[h]eadaches and [m]igraines."  (AR 216.)

from Los Angeles to Sacramento for her hearing (AR 36), as the
ALJ specifically noted (AR 23).   Similarly, the ALJ properly
relied on the inconsistency of her stating that she could lift
"maybe" five pounds because of her "back pain" (AR 51-53; see
also AR 237) but when questioned admitting that she could lift
her 15-pound baby (AR 52-53 ("I can lift the baby weight for
sure"; "I want to say she's 15 [pounds]")).   See DeBerry v.
Comm'r of Soc. Sec., 352 F. App'x 173, 177 (9th Cir. 2009)
(holding that ALJ did not err in discounting plaintiff's
testimony concerning her CFS based on inconsistencies between her
claimed functional limitations and what she told nurse about
them); Fleming, 274 F. App'x at 572 (ALJ properly discounted
plaintiff's claims about fatigue based in part on
"inconsistenc[i]es regarding complaints of discomfort when
undergoing an abdominal exam").

Although Plaintiff disputes the ALJ's characterization of
her testimony, her qualifier that she "wouldn't carry her [baby]
around for too long" (J. Stip. at 16 (citing AR 53)) doesn't
undermine his observation that she "provided inconsistent
information regarding how much she can lift" (AR 23).   The ALJ
properly concluded that the inconsistencies not only undermined
her allegations about her exertional limitations (see id.) but
suggested that she was exaggerating her symptoms, including her
fatigue (see AR 22 (finding Plaintiff's "general allegations of
disability" "inconsistent with" her daily activities)).   He was
entitled to so infer.   See Valentine, 574 F.3d at 693 (ALJ
properly discounted plaintiff's testimony when inconsistency
"suggest[ed] that [his] later claims about the severity of his

34

limitations were exaggerated"); <u>Rounds</u>, 807 F.3d at 1006 (in
assessing whether to credit plaintiff's subjective symptom
testimony, court can consider other inconsistent statements).

Similarly, Plaintiff asserts that the ALJ did not "expressly
or visibly account for fatigue, never mention[ed] SSR 14-1p," and
showed "no signs of comprehending CFS." (J. Stip. at 15 n.6.)
But the ALJ mentioned Plaintiff's fatigue more than 20 times
during his RFC discussion (<u>see</u> AR 19-23), and during the hearing
he repeatedly asked her about it (<u>see, e.g.</u>, AR 43 ("I know you
were having Chronic Fatigue and other related symptoms prior to
your pregnancy and childbirth.")) and any treatments she had
tried or medications she was taking for it (<u>see, e.g.</u>, AR 45
("What do you still do to try to address [chronic fatigue]
symptoms?"), 46 ("[I]s there any medication that you currently
take for [chronic fatigue]?")).  Not only did he fully consider
her allegations of fatigue, he partially credited them (<u>see</u> AR 23
(finding her allegations "partially consistent and supported by
her diligence in seeking care for her . . . fatigue syndrome")),
assessing limitations in excess of those found by any credited
doctor.  Thus, Plaintiff's assertion is without merit.  <u>See also</u>
<u>DeBerry</u>, 352 F. App'x at 176 (declining to consider argument that
ALJ "failed to properly apply" SSR concerning CFS because
plaintiff did "not argue the contention with any specificity").

Substantial evidence supported each of the reasons the ALJ
gave to discount Plaintiff's subjective symptom testimony.
Remand is not warranted on this basis.

2.   Any error in discounting the third-party statement
was harmless

a.   *Applicable Law*

"In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work." Bruce v. Astrue, 557 F.3d 1113, 1115 (9th Cir. 2009) (citing Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1053 (9th Cir. 2006)).  Such testimony is competent evidence and "cannot be disregarded without comment." Bruce, 557 F.3d at 1115 (emphasis in original) (citing Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996)); Robbins, 466 F.3d at 885 ("[T]he ALJ is required to account for all lay witness testimony in the discussion of his or her findings." (citation omitted)).  When rejecting the statements of a lay witness, an ALJ must give specific reasons germane to that witness. Diedrich v. Berryhill, 874 F.3d 634, 640 (9th Cir. 2017); Bruce, 557 F.3d at 1115.

If an ALJ errs by providing reasons that are not germane, the error may be harmless. See Valentine, 574 F.3d at 694.  An error is harmless if it is "'inconsequential to the ultimate nondisability determination' in the context of the record as a whole," Molina, 674 F.3d at 1122 (citations omitted); see also Tommasetti, 533 F.3d at 1038, such as when "the same evidence that the ALJ referred to in discrediting [the claimant's] claims also discredits [the lay witness's] claims," Molina, 674 F.3d at 1122 (alterations in original) (citing Buckner v. Astrue, 646 F.3d 549, 560 (8th Cir. 2011)).

36

b.   *Analysis*

As noted, Plaintiff's friend Frolov completed a third-party function report in which he stated that Plaintiff had severe limitations as a result of her fatigue.  (See AR 245-52.)  Although the ALJ did not assign weight to Frolov's statement, he implicitly rejected it by noting that "the medical evidence [did] not support" it.  (AR 24); see also Magallanes v. Bowen, 881 F.2d 747, 755 (9th Cir. 1989) (court may draw "specific and legitimate inferences from the ALJ's opinion").

The Ninth Circuit has held that lack of support from medical evidence is not a germane reason for discounting lay observations, at least in some cases.  See Diedrich, 874 F.3d at 640 (noting that lay observations "may offer a different perspective than medical records alone," which "is precisely why such evidence is valuable at a hearing").  But see Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005) (inconsistency with medical evidence can be germane reason for reecting testimony of "friends and family").  Thus, as a matter of law, the ALJ may have erred by rejecting Frolov's observations on this ground.  Any error was harmless, however.[24]

As discussed, the ALJ provided clear and convincing reasons for partially discounting Plaintiff's own testimony, thereby

---

[24] Plaintiff includes a number of undeveloped arguments about the sufficiency of the ALJ's analysis of Frolov's statement.  (See, e.g., J. Stip. at 17 (complaining that ALJ's stated reason was "casual" and "unexplained"); id. (suggesting that ALJ's analysis was inconsistent with SSR 14-1p).)  Because the Court finds that the ALJ likely failed to provide a valid reason for discounting Frolov's statement but that any error was harmless, it does not address those arguments.

establishing a sufficient basis for rejecting the friend's
similar statements.  See Valentine, 574 F.3d at 694 (finding that
although ALJ improperly discounted claimant's wife's testimony in
part because she was "an interested party," any error was
harmless because ALJ gave clear and convincing reasons for
rejecting claimant's "similar" subjective complaints); Molina,
674 F.3d at 1122 (holding that ALJ's error in rejecting lay
witnesses' testimony was "harmless" because "ALJ had validly
rejected all the limitations described by the lay witnesses in
discussing [claimant's] testimony").

Indeed, Frolov's function report was quite consistent with
Plaintiff's.  For example, he indicated that Plaintiff had
difficulty lifting, walking, stair climbing, standing, talking,
"[c]ompleting [t]asks," and concentrating.  (AR 250.)  Plaintiff
reported the same, plus problems sitting and with "memory."  (AR
238.)  Similarly, both said she had difficulty getting up in the
morning (see AR 246, (Frolov), 234 (Plaintiff)) and that stress
was a problem for her (AR 251 (Frolov), 239 (Plaintiff)).
Notably, both Plaintiff and Frolov agreed that her condition had
existed for the "past 3 years."  (Compare AR 245 (Frolov), with
AR 233 (Plaintiff).)  And one of Frolov's responses simply
parrots Plaintiff.  (See AR 246 ("She always complains she
doesn't get enough rest at night time.").)

Thus, because the ALJ provided sufficient reasons to
discount Plaintiff's similar testimony, any error by him in
rejecting Frolov's statements was harmless and remand is not
warranted on this ground.  See Molina, 674 F.3d at 1122.

38

3.   <u>The ALJ permissibly discounted the treating-source</u>
<u>opinions</u>

Plaintiff contends that the ALJ's weighing of the opinion evidence "requires reversal." (J. Stip. at 8.) Specifically, she argues that the ALJ improperly rejected the opinions of Dr. Goshike and Chang, her acupuncturist (<u>id.</u>), both of whom completed CFS-specific forms indicating that Plaintiff had extreme limitations (<u>see</u> AR 454-57, 471-74).[25] For the reasons discussed below, remand is not warranted.

a.   *Applicable Law*

Three types of physicians may offer opinions in Social Security cases: those who directly treated the plaintiff, those who examined but did not treat the plaintiff, and those who did neither. <u>See</u> <u>Lester</u>, 81 F.3d at 830. A treating physician's opinion is generally entitled to more weight than an examining physician's, and an examining physician's opinion is generally entitled to more weight than a nonexamining physician's. <u>Id.</u>; <u>see</u> § 404.1527(c)(1)-(2).[26] This is so because treating

_____

[25] The two forms were filled out essentially identically, with even the same portions of the form left blank. (<u>See</u> AR 456 & 473 (leaving blank questions pertaining to manipulative restrictions).)

[26] For claims filed on or after March 27, 2017, the rules in § 404.1520c (not § 404.1527) apply. <u>See</u> § 404.1520c (evaluating opinion evidence for claims filed on or after Mar. 27, 2017). The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." § 404.1520c(a). Thus, the new regulations eliminate the term "treating source" as well as what
                                                    (continued...)

physicians are employed to cure and have a greater opportunity to know and observe the claimant.  Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).  But even "the findings of a nontreating, nonexamining physician can amount to substantial evidence, so long as other evidence in the record supports those findings." Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996) (per curiam) (as amended).

The ALJ may discount a physician's opinion regardless of whether it is contradicted.  Magallanes, 881 F.2d at 751; see also Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008).  When a doctor's opinion is not contradicted by other medical-opinion evidence, however, it may be rejected only for a "clear and convincing" reason.  Magallanes, 881 F.2d at 751 (citations omitted); Carmickle, 533 F.3d at 1164 (citing Lester, 81 F.3d at 830-31).  When it is contradicted, the ALJ need provide only a "specific and legitimate" reason for discounting it.  Carmickle, 533 F.3d at 1164 (citing Lester, 81 F.3d at 830-31).  The weight given a doctor's opinion, moreover, depends on whether it is consistent with the record and accompanied by adequate explanation, among other things.  See § 404.1527(c); see also Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007) (factors in assessing physician's opinion include length of treatment relationship, frequency of examination, and nature and extent of treatment relationship).

_____

[26] (...continued)
is customarily known as the treating-source or treating-physician rule.  See § 404.1520c.  Plaintiff's claim was filed before March 27, 2017, and the Court therefore analyzes it under the treating-source rule in § 404.1527.

"Medical opinions" are statements from "acceptable medical sources," § 404.1527(a)(1), and "[o]nly physicians and certain other qualified specialists are considered '[a]cceptable medical sources,'" Ghanim v. Colvin, 763 F.3d 1154, 1161 (9th Cir. 2014) (quoting Molina, 674 F.3d at 1111); § 404.1502(a); see also § 404.1513(a).  An acupuncturist is not an acceptable medical source, see Wennet v. Saul, 777 F. App'x 875, 878 (9th Cir. 2019) (citing § 404.1502(a)), and whether an acupuncturist is a "medical source" at all turns on whether he is a licensed health-care worker, see §§ 404.1502(a) & (d), 404.1527(a).

b.   *The ALJ's Decision*

The ALJ gave "great weight" to the opinions of consulting doctors Fuchs and Liddell and initial reviewing doctors Amon and Harris because their opinions were consistent with each other and with "the medical record as a whole."  (AR 24.)

The ALJ gave Dr. Goshike's opinion "little weight" because it was, when it was rendered, the product of a "short treatment relationship."  (AR 24.)  Moreover, it was "not descriptive at all on symptoms or severity."  (Id.)

The ALJ gave Chang's opinion "[l]ittle weight," in part because the acupuncturist was "not an acceptable medical source." (AR 22; see AR 24.)  He also found the opinion — which cited "[n]o objective evidence" (AR 22) — inconsistent "with the record as a whole and not supported with relevant evidence."  (AR 24.) Moreover, it "appear[ed] to be a reflection of the claimant's own self reported subjective complaints."  (AR 22; see AR 24 (noting that Chang "relied heavily" on Plaintiff's "subjective report of symptoms and limitations").)

c.   *Analysis*

i.   *Dr. Goshike*

Because Dr. Goshike's opinion was inconsistent with the opinions of the consulting examiners and state-agency reviewing doctors, the ALJ needed to provide only a "specific and legitimate reason" for discounting it, <u>Carmickle</u>, 533 F.3d at 1164 (citation omitted), and he did so.

To start, the ALJ properly discounted Dr. Goshike's opinion based on her "short treatment relationship" with Plaintiff. (AR 24.) She is correct that a treating doctor's opinion should be given "more weight" as a "general rule." (J. Stip. at 8 (quoting <u>Lester</u>, 81 F.3d at 830).) But that's because treating doctors "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s)" and therefore "bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from . . . consultative examinations." § 404.1527(c)(2). Consequently, the "general rule" applies only when the doctor has seen the claimant "long enough to have obtained a longitudinal picture of [her] impairment." § 404.1527(c)(2)(i). Although Dr. Goshike was nominally a "treating" source, she had seen Plaintiff only "for the last month" (AR 454). Indeed, she filled out her disability form during their third appointment, on November 10, 2015. (<u>See</u> AR 403, 454-57.) Only one of the previous appointments concerned fatigue (<u>see</u> AR 338 (Sept. 18, 2015 treatment notes for "chronic fatigue")); the other was for a "well woman" exam (AR 337 (Oct. 2, 2015 treatment notes)). Nonetheless, Dr. Goshike opined that

42

Plaintiff's fatigue had been "persistent" for three years and

that she had symptoms that "persisted or recurred during six or

more consecutive months." (AR 454.)   Although Plaintiff contends

that this opinion was based on Dr. Goshike's review of

Plaintiff's records (J. Stip. at 8-9), nothing in the record so

indicates.   It is just as likely that the doctor simply wrote

what Plaintiff told her.   Indeed, at one point she wrote that the

"symptoms and limitations" described had lasted for three years

"according to patient." (AR 457.)   The ALJ was not required to

give Dr. Goshike's opinion more weight just because she had seen

Plaintiff twice before completing her disability forms.   See,

e.g., Quezada v. Berryhill, No. EDCV 16-1013-KS, 2017 WL 2312353,

at *5 (C.D. Cal. May 26, 2017) ("short treatment relationship"

with plaintiff was "specific and legitimate" reason to discount

treating-source opinion).[27]

The ALJ's conclusion that Dr. Goshike's CFS-specific form

opinion was "not descriptive at all on symptoms or severity" was

also sound. (AR 24.)   An ALJ "need not accept the opinion of any

_____

[27]   Even if Dr. Goshike's notation that Plaintiff had been
"with the Clinic since 6/2013" indicated that the doctor had
reviewed her records, as she claims (J. Stip. at 8-9), it does
not undermine the ALJ's observation that their relationship was a
"short" one (AR 24).   Indeed, reviewing the records would not
have put Dr. Goshike in a better position to opine about
Plaintiff's limitations than, for instance, the consulting and
reviewing doctors who reviewed the same records. (AR 90, 110,
461, 467); see DeBerry, 352 F. App'x at 176-77 (upholding ALJ's
discounting of treating doctor's opinion concerning history of
plaintiff's CFS because "she ha[d] no personal knowledge of
[plaintiff's] condition" before treatment began and her
perspective based on "retrospective review of the medical
records" "was . . . no different" from nontreating doctors);
§ 404.1527(c)(2)(i).

physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." Thomas, 278 F.3d at 957 (citation omitted); see Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004); see also Ford v. Saul, 950 F.3d 1141, 1155 (9th Cir. 2020) ("An ALJ is not required to take medical opinions at face value, but may take into account the quality of the explanation when determining how much weight to give a medical opinion.").

Although Dr. Goshike checked off "symptoms" from a form, she did not indicate the duration, frequency, or severity of any of them. (AR 455.) For instance, she noted that Plaintiff "ha[d] side effects" from medication but nowhere indicated what they were or whether they were severe enough to justify her aversion to them. (Id.) Similarly, she checked that "emotional factors contribute[d] to" her symptoms but did not identify what those factors were or how they contributed to her fatigue. (Id.) And she listed that she was "sensitive to humidity, noise, strong odors, chemicals, and if it is too hot or cold" but did not opine as to the cause or severity of those sensitivities. (AR 457.) And contrary to Plaintiff's contention (J. Stip. at 9-10), Dr. Goshike's treatment notes are equally vague. (See, e.g., AR 403 (Plaintiff presents with "muscle pain"), 405 (diagnosing Plaintiff with "Other fatigue (R53.83)")). Notably, they don't mention Plaintiff's purported sensitivities to, for example, noise and odors at all. (See AR 334-40, 403-05).[28] The ALJ

---

[28] Nor do any other treatment records, from Plaintiff's primary-care clinic or elsewhere.

44

properly noted the conclusory and unsupported nature of Dr.
Goshike's opinion and appropriately discounted it accordingly.
See Crane v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996) (ALJ
properly rejected doctor's opinion because check-off reports did
not contain any explanation of bases for their conclusions).

The ALJ properly discounted Dr. Goshike's form opinion.

### ii. *James Chang*

Initially, Chang is not an "acceptable medical source," as
the ALJ noted (AR 22, 24) and as Plaintiff apparently concedes
(see J. Stip. at 10 (contending that Chang was "medical source"
but not "acceptable medical source")). See Wennet, 777 F. App'x
at 878 (acupuncturist not "[a]cceptable medical source" (citing
§ 404.1502(a))).[29]  Although that may not itself have been a
valid reason to discount his opinion, see Haagenson v. Colvin,
656 F. App'x 800, 802 (9th Cir. 2016), because Chang's was not a
"medical opinion" under §§ 404.1527(a)(1) and 404.1513(a)(2), the
ALJ needed to give only a "germane" reason to discount it,
Ghanim, 763 F.3d at 1161; see also Greger v. Barnhart, 464 F.3d
968, 972 (9th Cir. 2006) (ALJ must take into account lay
testimony but may discount that testimony by providing reasons

---

[29] Defendant states that whether Chang is "licensed as a
healthcare worker by the state," and therefore whether he is a
"medical source" under § 404.1502(d), is "unclear." (J. Stip. at
39 n.3.)  Chang is licensed, however. (See AR 531 ("L.Ac." in
Chang's signature)); see also Cal. Dep't Consumer Aff. License
Search, https://search.dca.ca.gov (search for license number 5606
under acupuncturists' licenses) (last visited May 7, 2020).  But
the distinction is of little significance given that "[o]pinions
from medical sources who are not acceptable medical sources and
from nonmedical sources" are evaluated identically.
§ 404.1527(f).

germane to that witness), and he did so.  *See* Hayes v. Berryhill,
721 F. App'x 648, 651 (9th Cir. 2018) (ALJ "erred by discounting
vocational counselor['s] . . . lay opinion because he [was] not
an 'acceptable medical source,'" but any error was harmless
because "ALJ properly discounted [his] opinion for two other
germane reasons").

     The ALJ properly discounted Chang's opinion as premised
primarily on Plaintiff's self-reported complaints.  (See AR 22,
24.)  Indeed, some of Chang's opinions explicitly incorporated
Plaintiff's subjective complaints.  (See, e.g., AR 472 (Plaintiff
suffered from "self-reported impairment in short-term memory").)
Others can only be explained as regurgitations of them.  (See,
e.g., AR 471 (Plaintiff "spent most of her day in bed"), 472
(Plaintiff experienced "[u]nrefreshing sleep" and "[p]ost-
exertional malaise lasting more than 24 hours").)  Moreover, he
stated that she had been "incapacitated since 2012" even though
he had treated her only for five months beginning in November
2013.  (AR 471.)  Because the ALJ had already properly discounted
Plaintiff's subjective symptoms, as discussed, he was entitled to
discount Chang's opinion stemming from them.  See Vanessa P. v.
Saul, Comm'r of Soc. Sec., No. 2:19-cv-00253-MKD, 2020 WL
1433580, at *12 (E.D. Wash. Mar. 23, 2020) (that mental-health
counselor's opinion "relied on [p]laintiff's discredited symptom
complaints in assessing serious limitations" was "germane reason
for discounting" it); see also Tommasetti, 533 F.3d at 1041 (ALJ
may reject treating physician's opinion "based 'to a large
extent' on a claimant's self-reports that have been properly
discounted as incredible" (citation omitted)).

1    Moreover, the opinion cited no objective evidence, as the

2  ALJ noted.  (AR 22.)  Plaintiff does not dispute that but instead

3  points to certain notations in Chang's treatment notes — which,

4  she concedes, "rarely included an '[o]bjective' entry" (J. Stip.

5  at 11) — that she contends constituted "objective" evidence to

6  support Chang's CFS form opinion (id.), including the following,

7  from his November 5, 2013 intake notes:

8    Pulse:  deep, thin, weak Tongue: teethmarks, pale, thin,

9    coating is medium white.  Bad breath.

10  (AR 531.)  The regulations define "[o]bjective medical evidence"

11  to mean "laboratory findings" and observable "anatomical,

12  physiological, or psychological abnormalities" shown by

13  "medically acceptable clinical diagnostic techniques."

14  § 404.1502(f) & (g).  Although Chang's notations arguably

15  described observable conditions, nothing indicates that they were

16  obtained through medically acceptable clinical diagnostic

17  techniques.[30]  The ALJ thus reasonably concluded that no

18  objective evidence supported Chang's opinion, and he properly

19  discounted it accordingly.  See Haberman v. Colvin, No.

20  13-cv-05844 JRC., 2014 WL 3511124, at *6 (W.D. Wash. July 14,

21  2014) (that lay opinion "contain[ed] few objective findings in

22

23    [30] Plaintiff suggests that the ALJ discounted Chang's
   opinion because it was based on "traditional-Chinese" medicine
24  but concedes that the "regulations don't address [the] issue."
   (J. Stip. at 12; see id. ("[C]ould the decision mean that Chang's
25  citations to Chinese medical principles are inconsistent with the
   allopathic orientation of the record's remainder?").)  The ALJ
26  did not discount the opinion on that basis, however; he
   discounted it because it did not contain objective findings.
27  That, as noted, is squarely addressed by the regulations.  See
   § 404.1527(c)(3).
28

support of the degree of limitation opined" was "germane" reason to reject it); § 404.1527(c)(3) (ALJ may consider extent to which medical source "presents relevant evidence to support" opinion, "particularly medical signs and laboratory findings"); see also Orn, 495 F.3d at 634 (greater weight given opinion containing "results from medical tests and laboratory findings").

The ALJ also properly concluded that Chang's opinion was inconsistent with the medical record (see AR 24 (ALJ finding Chang's opinion inconsistent "with the record as a whole and not supported with relevant evidence")), which is a valid reason to discount a medical source's opinion.  See Roberts v. Berryhill, 734 F. App'x 489, 490 (9th Cir. 2018) (holding that ALJ did not err in rejecting physical therapist's opinion concerning plaintiff's CFS because it conflicted with opinions of "acceptable medical sources" and record as a whole); Vanessa P., 2020 WL 1433580, at *13 (inconsistency with "record as a whole" was "germane" reason to discount counselor's opinion); see also Orn, 495 F.3d at 631 ("consistency of . . . opinion with the record as a whole" is relevant factor in evaluating medical opinion).  As noted, the opinion was directly contradicted by the opinions of the consulting and reviewing doctors, all of whom opined that Plaintiff had less than marked limitation (see AR 90, 110, 461, 467).  Because the ALJ properly gave those opinions "great weight" (AR 24), he was entitled to discount Chang's inconsistent opinion accordingly.

The ALJ gave valid reasons for discounting the opinions of Plaintiff's treating sources.  Remand is not warranted on this basis.

1          4.   The ALJ's RFC explanation was adequate

2          Plaintiff asserts that the ALJ's "RFC explanation is

3    legally" inadequate.  (J. Stip. at 4.)  Her primary argument,

4    that "the decision simply gives no explanation" for its

5    conclusions, appears to rest on Social Security Ruling 96-8p,

6    1996 WL 374184 (July 2, 1996).  (J. Stip. at 5; see id. at 4-7.)

7    That argument is without merit.

8          "Although the ALJ's analysis need not be extensive, the ALJ

9    must provide some reasoning in order for [a reviewing court] to

10   meaningfully determine whether the ALJ's conclusions were

11   supported by substantial evidence."  Treichler, 775 F.3d at 1103

12   (citation omitted); see also Alaska Dep't of Envtl. Conservation

13   v. E.P.A., 540 U.S. 461, 497 (2004) ("Even when an agency

14   explains its decision with 'less than ideal clarity,' a reviewing

15   court will not upset the decision on that account 'if the

16   agency's path may reasonably be discerned.'" (quoting Bowman

17   Transp., Inc. v. Arkansas—Best Freight Sys., Inc., 419 U.S. 281,

18   286 (1974))).

19         Social Security Ruling 96-8p provides that the ALJ's RFC

20   assessment must include a "narrative discussion" describing how

21   the evidence supports his conclusions, with citation to

22   "specific" medical facts and nonmedical evidence.  SSR 96-8p,

23   1996 WL 374184, at *7.  The ALJ must identify any "material

24   inconsistencies or ambiguities in the evidence" and explain how

25   he "considered and resolved" them.  Id.  Any discussion of a

26   claimant's subjective symptoms, moreover, must "[c]ontain a

27   thorough discussion and analysis of the objective medical and

28   other evidence, including the individual's complaints of pain and

49

1  other symptoms," "[i]nclude a resolution of any inconsistencies
2  in the evidence as a whole," and "[s]et forth a logical
3  explanation of the effects of the symptoms, including pain, on
4  the individual's ability to work." Id.

5      Initially, the ALJ's decision includes more than five pages
6  of discussion concerning his RFC determination that complies, on
7  its face, with SSR 96-8p's requirements. (See AR 19-24.)  Its
8  holistic discussion of the medical and nonmedical evidence has
9  citations to specific facts, including conflicting ones. (See
10 generally id.)  And it includes a complete summary of Plaintiff's
11 subjective allegations, with a detailed analysis explaining why
12 they should be partially discounted. (See AR 20-23.)  Indeed,
13 the Court found the decision more than sufficient to facilitate
14 review. See Treichler, 775 F.3d at 1103 (indicating that purpose
15 of explication requirement is to enable judicial review of
16 administrative decisions).

17     Plaintiff argues that the ALJ's ultimate RFC determination
18 was not entirely consistent with any particular doctor's opinion,
19 especially given that he gave all the consulting and reviewing
20 doctors' opinions "great weight" even though they were not
21 completely consistent with each other. (See J. Stip. at 6
22 (complaining that "equally credited [medical] sources differ from
23 each other and from the decision").)  But RFC is an
24 administrative determination, not a medical one, and the ALJ was
25 not required to adopt any specific medical source's RFC opinion
26 as his own. See Vertigan v. Halter, 260 F.3d 1044, 1049 (9th
27 Cir. 2001) ("It is clear that it is the responsibility of the
28 ALJ, not the claimant's physician, to determine residual

50

functional capacity."); § 404.1546(c) ("[T]he administrative law judge . . . is responsible for assessing your residual functional capacity."). Moreover, the ALJ found Plaintiff's limitations to be somewhat more severe than did the examining and reviewing doctors — the "equally credited sources" (J. Stip. at 6). So even if the ALJ failed to explain any inconsistencies among those sources' opinions, any error was harmless. See Stout, 454 F.3d at 1055 (nonprejudicial or irrelevant mistakes are harmless). Plaintiff's suggestion that she was prejudiced because "there were more limiting RFC opinions" (J. Stip. at 7) is a red herring. Initially, she cannot rely on Dr. Goshike's or Chang's opinions because they were, as discussed, properly discounted. Moreover, the purported error at issue here concerns the ALJ's handling only of the consulting and reviewing doctors' opinions, and none of those opinions support her allegations of disability.

Plaintiff also complains that the ALJ did not assign weight to the state-agency reconsideration doctors. (Id. at 6.) The ALJ indeed failed to assign weight to those opinions, and he erred in so doing. See SSR 96-8p, 1996 WL 374184, at *7 (ALJ "must always consider and address medical source opinions"; if his assessment conflicts with an opinion, he must "explain" the departure); § 404.1527(c). But the reconsideration doctors' opinions were based on the same evidence as the initial doctors' opinions and were identical to them. As noted, the ALJ gave the initial opinions great weight. (See AR 24.) The error, thus, was plainly harmless. See Ushakova v. Astrue, No. 2:11-cv-01920 KJN., 2012 WL 4364278, at *10 (E.D. Cal. Sept. 21, 2012) (finding ALJ's failure to assign weight to reviewing reconsideration

51

doctor harmless because doctor rendered same functional assessment as initial doctor, and his assessment was based on review of same clinical findings).

Plaintiff argues that the ALJ's reasons for discounting her subjective symptom testimony "do not serve as reviewable explanations of the RFC elements of light capacity (the individual components of which SSR 96-8p says must first be explained before deploying this umbrella-term)." (J. Stip. at 5 (emphasis in original).) Although her exact argument is difficult to discern, to the extent she argues that the ALJ erred by not describing her RFC on a function-by-function basis, the argument fails. Social Security Ruling 96-8p provides that

[t]he [ALJ's] RFC assessment must first identify the [claimant's] functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . . Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

SSR 96-8p, 1996 WL 374184, at *1. As noted, the ALJ found that Plaintiff could "perform light work as defined in 20 CFR 404.1567(b)" with some additional limitations, which he specifically outlined. (AR 19.) Because the regulations define "light work" on a function-by-function basis, see § 404.1567(b), and because the ALJ incorporated that definition into his RFC (see AR 19), he necessarily complied with SSR 96-8p's function-by-function requirement. See Buckner-Larkin v. Astrue, 450 F. App'x 626, 627 (9th Cir. 2011) ("[I]n accordance with Social Security Ruling 96-8p, the ALJ defined [plaintiff's] RFC as

52

'sedentary,' . . . which includes well-defined function-by-function parameters." (citation omitted)).[31]

Finally, Plaintiff speculates that the ALJ based his finding that she could "adapt to occasional workplace changes" (AR 19) on Dr. Liddell's opinion that she was "moderately impaired" in her ability to deal with workplace changes (AR 467). (See J. Stip. at 7.) She argues that "moderate" and "occasional" are "not the same thing" and that the ALJ's purported translation of one into the other was therefore error. (Id.) But Plaintiff concedes that "moderate" is not defined by the regulations. (Id.) Moreover, the two findings were made in different contexts: "moderate" as used by Dr. Liddell described the severity of one of Plaintiff's impairments (see AR 467), whereas "occasional" quantified her workplace abilities (see AR 20). Thus, there is no basis to conclude that the ALJ's RFC and Dr. Liddell's opinion were inconsistent, as Plaintiff claims, let alone that the ALJ's consideration of Dr. Liddell's finding was unreasonable. To the contrary, the Ninth Circuit has repeatedly held that a "moderate" limitation in an area like ability to deal with workplace changes translates into the type of RFC the ALJ assessed here. See, e.g., Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1173 (9th Cir. 2008) (ALJ reasonably translated finding that plaintiff was "moderately limited" in several mental-functioning areas into RFC to perform "simple, routine, repetitive" work); Rogers v. Comm'r

_____

[31] Plaintiff's attorney has raised this argument before, and at least one court has called it "frivolous." See Rodriguez v. Colvin, No. 2:15-cv-0231-CKD, 2016 WL 258341, at *2 (E.D. Cal. Jan. 21, 2016), aff'd sub nom., Rodriguez v. Berryhill, 709 F. App'x 859 (9th Cir. 2017).

1  of Soc. Sec. Admin., 490 F. App'x 15, 17 (9th Cir. 2012) (finding

2  that plaintiff who was "moderately limited" in ability to, among

3  other things, "respond appropriately to changes in the work

4  setting" was properly evaluated in RFC to perform "simple routine

5  tasks" "in unskilled work").

6       Plaintiff argues in her reply that her "interpretation" of

7  the facts underlying the ALJ's reasoning — and purported error —

8  is "equally plausible." (J. Stip. at 21.)  Even if that were

9  true, however, a tie goes to the Commissioner.  See Reddick, 157

10 F.3d at 720-21.

11      The ALJ's RFC explanation was legally adequate, and any

12 error was harmless.  Remand is not warranted on this basis.

13 **VI.  CONCLUSION**

14      Consistent with the foregoing and under sentence four of 42

15 U.S.C. § 405(g),[32] IT IS ORDERED that judgment be entered

16 AFFIRMING the Commissioner's decision, DENYING Plaintiff's

17 request for remand, and DISMISSING this action with prejudice.

18

19 DATED: May 13, 2020          _____

20                              JEAN ROSENBLUTH
                                U.S. MAGISTRATE JUDGE
21

22

23

24

25

---

26      [32] That sentence provides: "The [district] court shall have
   power to enter, upon the pleadings and transcript of the record,
27 a judgment affirming, modifying, or reversing the decision of the
   Commissioner of Social Security, with or without remanding the
28 cause for a rehearing."